Citation Nr: 1554494 
Decision Date: 12/31/15 Archive Date: 01/07/16

DOCKET NO. 13-09 499 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Salt Lake City, Utah


THE ISSUES

1. Entitlement to an initial compensable rating for residuals of a proximal phalanx fracture of the left ring finger.

2. Entitlement to an initial compensable rating for allergic rhinitis.

3. Entitlement to an initial compensable rating for irritable bowel syndrome (IBS).

4. Entitlement to an initial compensable rating for erectile dysfunction.

5. Entitlement to an initial compensable rating for gynecomastia.

6. Entitlement to an initial compensable rating for pseudofolliculitis barbae (PFB).

7. Entitlement to service connection for bilateral hearing loss.

8. Entitlement to service connection for malaria.
9. Entitlement to service connection for obstructive sleep apnea.

10. Entitlement to service connection for anemia.

11. Entitlement to service connection for hypertension.

12. Entitlement to service connection for dry skin, to include eczema.


ATTORNEY FOR THE BOARD

R. Casadei, Counsel


INTRODUCTION

The Veteran had active service from September 1991 to March 2012. 

This case comes before the Board of Veterans' Appeals (Board) on appeal from a July 2012 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) in Salt Lake City, Utah. This appeal was processed using the Veterans Benefits Management System (VBMS). In evaluating this case, the Board has also reviewed the "Virtual VA" system to ensure a complete assessment of the evidence.

The issues on appeal were previously remanded by the Board in March 2015 for further evidentiary development of requesting outstanding post-service VA and private treatment records. This was accomplished, and the claims were readjudicated in a September 2015 supplemental statement of the case. For this reason, the Board concludes that that the Board's remand orders have been substantially complied with, and it may proceed with a decision at this time. See Dyment v. West, 13 Vet. App. 141, 146-47 (1999) (remand not required under Stegall v. West, 11 Vet. App. 268 (1998), where the Board's remand instructions were substantially complied with), aff'd, Dyment v. Principi, 287 F.3d 1377 (Fed. Cir. 2002).
The issue of service connection for dry skin, to include eczema, is addressed in the REMAND portion of the decision below and is REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDINGS OF FACT

1. For the entire rating period on appeal, the Veteran's left hand disability (ring finger) is shown to be manifested by pain, limitation of motion, decreased grip strength, and decreased ability to lift, especially during periods of flare-ups.

2. For the entire rating period on appeal, the Veteran's allergic rhinitis has not manifested nasal polyps or greater than 50 percent obstruction of nasal passages on both sides or complete obstruction on one side.

3. For the entire rating period on appeal, the Veteran experienced moderate episodes of IBS with frequent episodes of abdominal pain and associated bowel symptoms.

4. The evidence does not show that the Veteran has a penile deformity.

5. The Veteran's gynecomastia disability is not manifested by impairment in the function of the urinary systems or the skin.

6. The Veteran's PFB affects less than 5 percent of the his total body area.

7. The Veteran's right and left ear hearing impairment do not meet the criteria for hearing loss disability for VA compensation purposes.

8. The Veteran does not have active malaria or any residuals of malaria. 

9. The Veteran does not have a current diagnosis of obstructive sleep apnea.

10. The Veteran does not have a current diagnosis of anemia.
11. The Veteran does not have currently diagnosed hypertension.


CONCLUSIONS OF LAW

1. The criteria for a rating of 10 percent, but no higher, for residuals of the left ring finger proximal phalanx fracture have been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 4.3, 4.7, 4.71a, Diagnostic Codes 5230, 5227 (2015).

2. The criteria for a compensable rating for chronic allergic rhinitis have not been met. 38 U.S.C.A. §§ 1155, 5102, 5103, 5103A, 5107 (West 2014); 38 C.F.R. 
§§ 3.159, 3.321, 4.97, Diagnostic Code 6522 (2015).

3. The criteria for a rating of 10 percent, but no higher, for IBS have been met. 
38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. §§ 4.7, 4.20, 4.113, 4.114, Diagnostic Code 7319 (2015).

4. The criteria for a compensable rating for erectile dysfunction have not been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. § 4.115b, Diagnostic Code 7522 (2015).

5. The criteria for an initial compensable rating for gynecomastia have not been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 4.1-4.7, 4.21, 4.31, 4.116, Diagnostic Code 7628 (2015).

6. The criteria for an initial compensable rating for pseudofolliculitis barbae have not been met. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. §§ 4.1, 4.2, 4.71a, Diagnostic Codes 7813-7806 (2015). 

7. The criteria for service connection for bilateral hearing loss have not been met. 
38 U.S.C.A. §§ 1110, 1112, 1113, 1154(b), 5107 (West 2014); 38 C.F.R. 
§§ 3.102, 3.303, 3.304, 3.307, 3.309, 3.385 (2015).
8. The criteria for service connection for malaria have not been met. 38 U.S.C.A. §§ 1110, 1112, 1113, 1154(b), 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.304, (2015).

9. The criteria for service connection for obstructive sleep apnea have not been met. 38 U.S.C.A. §§ 1110, 1112, 1113, 1154(b), 5107 (West 2014); 38 C.F.R. 
§§ 3.102, 3.303, 3.304, (2015).

10. The criteria for service connection for anemia have not been met. 38 U.S.C.A. §§ 1110, 1112, 1113, 1154(b), 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.304, (2015).

11. The criteria for service connection for hypertension have not been met. 
38 U.S.C.A. §§ 1110, 1112, 1113, 1154(b), 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.304, 3.307, 3.309 (2015).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Duties to Notify and Assist

The Veterans Claims Assistance Act of 2000 (VCAA) and implementing regulations imposes obligations on VA to provide claimants with notice and assistance. 38 U.S.C.A. §§ 5102, 5103, 5103A, 5107, 5126 (West 2014); 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a) (2015). The notice requirements of VCAA require VA to notify the claimant of what information or evidence is necessary to substantiate the claim; what subset of the necessary information or evidence, if any, the claimant is to provide; and what subset of the necessary information or evidence, if any, the VA will attempt to obtain. 

The United States Court of Appeals for Veterans Claims (Court) issued a decision in the appeal of Dingess v. Nicholson, 19 Vet. App. 473 (2006), which held that the notice requirements of 38 U.S.C.A. § 5103(a) and 38 C.F.R. § 3.159(b) apply to all five elements of a service connection claim, including the degree of disability and the effective date of an award. Those five elements include: (1) veteran status; 
(2) existence of a disability; (3) a connection between a veteran's service and the disability; (4) degree of disability; and (5) effective date of the disability. 

In a timely letter dated in November 2011, the RO provided notice to the Veteran regarding what information and evidence is needed to substantiate a claim for service connection, as well as what information and evidence must be submitted by the Veteran and what evidence VA would obtain. The notice included provisions for disability ratings and for the effective date of the claim. 

The Veteran's claims for higher initial evaluations are downstream issues, which were initiated by the notice of disagreement. The Court has held that, as in this case, once a notice of disagreement from a decision establishing service connection and assigning the rating and effective date has been filed, the notice requirements of 38 U.S.C.A. §§ 5104 and 7105 control as to the further communications with the appellant, including as to what "evidence [is] necessary to establish a more favorable decision with respect to downstream elements..." Goodwin v. Peake, 22 Vet. App. 128, 137 (2008). Thus, there is no duty to provide additional notice.

The Veteran's service treatment records, post-service treatment records, and the Veteran's statements are associated with the claims file. The Veteran was also afforded VA examinations in connection with his claims in November 2011, December 2011, November 2012, September 2013, November 2013, and November 2014. To that end, when VA undertakes to provide a VA examination or obtain a VA opinion, it must ensure that the examination or opinion is adequate. Barr v. Nicholson, 21 Vet. App. 303, 312 (2007). The Veteran's history was taken and complete examinations were conducted that included specific clinical measures and physical examinations. Conclusions reached and diagnoses given were consistent with the examination reports. For these reasons, the Board finds that the Veteran has been afforded an adequate examination on the rating issues currently on appeal. Nieves-Rodriguez v. Peake, 22 Vet. App. 295 (2008).

Significantly, the Veteran and his representative have not identified, and the record does not otherwise indicate, any additional existing evidence that is necessary for a fair adjudication of the claims that has not been obtained. Hence, no further notice or assistance to the Veteran is required to fulfill VA's duty to assist in the development of the claims. Smith v. Gober, 14 Vet. App. 227 (2000), aff'd 281 F.3d 1384 (Fed. Cir. 2002); Dela Cruz v. Principi, 15 Vet. App. 143 (2001).

General Disability Rating Criteria

Disability ratings are determined by applying the criteria set forth in the VA Schedule for Rating Disabilities (Rating Schedule) found in 38 C.F.R. Part 4. 
38 U.S.C.A. § 1155. It is not expected that all cases will show all the findings specified; however, findings sufficiently characteristic to identify the disease and the disability therefrom and coordination of rating with impairment of function will be expected in all instances. 38 C.F.R. § 4.21. 

Where there is a question as to which of two evaluations (ratings) shall be applied, the higher rating will be assigned if the disability picture more nearly approximates the criteria for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. 
§ 4.7. When there is an approximate balance of positive and negative evidence regarding the merits of an issue material to the determination of the matter, the benefit of the doubt in resolving each such issue shall be given to the claimant. 
38 U.S.C.A. § 5107(b); 38 C.F.R. §§ 4.3, 4.7. 

In deciding this appeal, VA has specifically considered whether separate ratings for different periods of time are warranted, assigning different ratings for different periods of the Veteran's appeal. Fenderson v. West, 12 Vet. App. 119 (1999); Hart v. Mansfield, 21 Vet. App. 505 (2008).

Rating for Left Ring Finger Disability

The Veteran essentially contends that his left ring finger disability is manifested by symptomatology more nearly approximating a rating in excess of the current noncompensable (zero percent) rating assigned under 38 C.F.R. § 4.71a, Diagnostic Code 5230.
Under Diagnostic Code 5230, a maximum zero percent rating is assigned for any limitation of motion of the ring or little finger (whether on the major (dominant) or minor (non-dominant) hand). 38 C.F.R. § 4.71a.

A maximum zero percent rating is assigned under Diagnostic Code 5227 for favorable or unfavorable ankylosis of the ring or little finger (whether on the major (dominant) or minor (non-dominant) hand). 38 C.F.R. § 4.71a, Diagnostic Code 5227 (2015). A Note to Diagnostic Code 5227 provides that evaluation as amputation should be considered and whether an additional evaluation is warranted for any resulting limitation of motion of other digits or interference with the overall function of the hand.

In order for ankylosis to be rated as amputation, the condition must manifest with extremely unfavorable ankylosis. See Note (3)(i) preceding 38 C.F.R. § 4.71a, Diagnostic Code 5216, unfavorable ankylosis of five digits of one hand. In other words, in order to be evaluated as amputation, there must be ankylosis of both the metacarpophalangeal and proximal interphalangeal joints either in extension or full flexion or with rotation or angulation of a bone. 38 C.F.R. § 4.71a, Diagnostic Code 5216 (2015). Note (3)(ii) explains that if both the metacarpophalangeal and proximal interphalangeal joints of a digit were ankylosed, it should be evaluated as unfavorable ankylosis even if each joint was individually fixed in a favorable position. Note (3)(iii) indicates that if only the metacarpophalangeal or proximal interphalangeal joints were ankylosed and there was a gap of more than 2 inches (5.1 cm.) between the fingertips and the proximal transverse crease of the palm, with the fingers flexed to the extent possible, the condition should be evaluated as unfavorable ankylosis. 

Consideration is to be given to whether there is less movement than normal, more movement than normal, weakened movement, excess fatigability, incoordination, pain on movement, swelling, deformity or atrophy of disuse, instability of station, or interference with standing, sitting, or weight bearing. For the purpose of rating disability from arthritis, multiple involvements of the metacarpal and carpal joints of the upper extremities are considered groups of minor joints ratable on a parity with major joints. 38 C.F.R. § 4.45 (2015). VA must consider "functional loss" of a musculoskeletal disability separately from consideration under the diagnostic codes; "functional loss" may occur as a result of weakness, fatigability, incoordination, or pain on motion. 38 C.F.R. §§ 4.40, 4.45, 4.59; DeLuca v. Brown, 8 Vet. App. 202 (1995).

The evidence includes a November 2013 VA examination (in VBMS). The examiner diagnosed the Veteran with a healed proximal phalanx fracture of the left ring finger. The Veteran denied that flare-ups impacted the function of the hand. However, he did report limited gripping due to pain. Upon physical examination, the examiner noted that there was evidence of limited motion of the left ring finger, but no gap between the thumb pad and the fingers. Flexion and extension of the finger was normal. After repetitive use testing there was limitation of motion of the left ring finger, but again no gap between the thumb pad and the fingers. Functional loss was noted to involve less movement than normal and pain on movement of the ring finger. Hand grip in the left hand was 4/5 with 5 being normal grip strength. There was no ankylosis of any finger. X-ray imaging results showed no abnormal findings. The examiner also noted that the Veteran's disability was limited to lifting 10 to 15 pounds. 

The Veteran was afforded a VA examination in November 2014 (in Virtual VA). The examiner reviewed the evidence of record and diagnosed the Veteran with proximal interphalangeal joint sprain of the left ring finger. The Veteran reported that he experienced daily, severe, mechanical pain of his left ring finger proximal interphalangeal joint. He stated that he had effusion of the joint following strenuous or repetitive use. A physical examination of the left hand showed limitation of motion of the ring and little finger. However, there was no gap between the thumb pad and the fingers. A gap of less than 1 inch was noted between the left ring and little finger and the proximal transverse crease of the palm. Painful motion was noted to begin at a gap of less than 1 inch. There was no limitation of extension of the fingers. After repetitive use testing there was no additional limitation of motion of any finger. Functional loss was noted to involve less movement than normal and pain on motion of the ring and little finger. Hand grip was normal. There was no ankylosis of any fingers. X-ray imaging results of the left hand showed no acute fracture or dislocation. There was negative ulnar variance and no significant soft tissue abnormality. There were no foreign bodies identified and no advanced degenerative changes. The examiner also noted that the Veteran was not experiencing a flare-up at the time of examination. Based on the available medical documentation and current medical history and physical examination findings, the examiner was unable to comment on whether pain, weakness, fatigability, or incoordination could significantly limit functional ability during flare-ups, or when the joint is used repeatedly over a period of time without resorting to mere speculation.

As discussed above, a noncompensable rating is the maximum rating under Diagnostic Code 5230. A noncompensable rating is also the maximum rating under Diagnostic Code 5227 for ankylosis of the ring or little finger. Thus, no increased schedular evaluation is warranted under these diagnostic codes.

Despite the lack of evidence of extreme unfavorable ankylosis or amputation of the right little finger, the Board finds that a rating of 10 percent is warranted pursuant to the DeLuca criteria, based upon the Veteran's limitation of motion and pain on motion during flare-ups. Further, the Veteran has complained of effusion of the joint following strenuous or repetitive use, which affects his ability to grasp and limits his ability to lift objects weighing more than 15 pounds. DeLuca v. Brown, 8 Vet. App. 202, 206 (1995). 

The Board is cognizant of the amputation rule, which states that the combined rating for disabilities of an extremity shall not exceed the rating for the amputation at the elective level, were amputation to be performed. 38 C.F.R. § 4.68 (2015). As stated above, amputation of the ring finger at the proximal interphalangeal joint warrants a 10 percent rating pursuant to Diagnostic Code 5155. The record shows no evidence of amputation or symptoms that would warrant assigning a rating based on amputation. Therefore, a rating in excess of 10 percent is not warranted.

Rating for Allergic Rhinitis

The Veteran essentially contends that his allergic rhinitis disability is manifested by symptomatology more nearly approximating a rating in excess of the current noncompensable (zero percent) rating assigned under 38 C.F.R. § 4.97, Diagnostic Code 6522 (allergic or vasomotor rhinitis).

Under Diagnostic Code 6522, allergic rhinitis warrants a 10 percent rating when there are no nasal polyps but there is greater than 50 percent obstruction of nasal passages on both sides or complete obstruction on one side. A maximum rating of 30 percent is warranted when polyps are present. 38 C.F.R. § 4.97, Diagnostic Code 6522.

The Board finds that, upon review of all the evidence of record, the Veteran's rhinitis has not included nasal polyps or greater than 50 percent obstruction of nasal passages on both sides or complete obstruction on one side. 

The Veteran was afforded a VA examination in November 2011 (see Virtual VA document dated 5/11/12). During the evaluation, the Veteran reported having itchy, watery eyes and a runny nose alternating with congestion. His symptoms were noted to have waxed and waned since 2005. He reported using antihistamines and eye drops, but was not currently on any medication. The Veteran was diagnosed with allergic rhinitis. Upon physical examination, the examiner noted that there was not greater than 50 percent obstruction of the nasal passages on both sides. There were no nasal polyps or permanent hypertrophy of the nasal turbinates. 

The evidence includes a September 2013 VA examination. See Virtual VA, document dated 9/7/13. The examiner noted that the Veteran was currently asymptomatic of a sinus condition and was currently on no medication for such condition.

The Veteran was afforded another VA examination in November 2014 (in VBMS). The Veteran reported ongoing symptoms of sneezing and sore throat associated with his condition and reported taking Loratadine which helped somewhat with his symptoms. The examiner confirmed the diagnosis of allergic rhinitis. Upon physical examination, the examiner noted that there was not greater than 50 percent obstruction of the nasal passages on both sides. There were no nasal polyps or permanent hypertrophy of the nasal turbinates. 
The remaining evidence of record, to include post-service VA and private treatment records, do not show that the Veteran has nasal polyps or obstruction of the nasal passages. 

For these reasons, the Board finds that the Veteran's allergic rhinitis has not included nasal polyps or greater than 50 percent obstruction of nasal passages on both sides or complete obstruction on one side. Accordingly, the Board finds that a compensable rating for chronic allergic rhinitis is not warranted for any period on appeal under Diagnostic Codes 6522. To the extent any higher level of compensation is sought, the preponderance of the evidence is against this claim, and hence the benefit-of-the-doubt doctrine does not apply. 38 U.S.C.A. § 5107(b); 
38 C.F.R. §§ 4.3, 4.7.

Rating for IBS 

The Veteran seeks a compensable rating for symptoms associated with his IBS disability. The Veteran's service-connected IBS has been properly rated under Diagnostic Code 7319 for irritable colon syndrome. 38 C.F.R. § 4.114, Diagnostic Code 7319. 

Under Diagnostic Code 7319, a 0 percent evaluation is assigned for mild disturbances of bowel function with occasional episodes of abdominal distress. A 10 percent evaluation is assigned for moderate IBS, with frequent episodes of bowel disturbance with abdominal distress. A maximum disability rating of 30 percent is warranted for severe IBS productive of diarrhea, or alternating diarrhea and constipation, with more or less constant abdominal distress. Id.

The Veteran was afforded a VA examination in November 2011 (see Virtual VA document dated 5/11/12). During the evaluation, the Veteran reported having developed problems with frequent loose, soft, and liquid stools. He stated that he experienced loose stools after eating any meal. He also reported frequent sharp abdominal pains. The Veteran was diagnosed with irritable bowel syndrome. The examiner noted that the Veteran took Pepto Bismol to help alleviate symptoms. The examiner noted that the Veteran had "occasional" episodes of bowel disturbance with abdominal distress. The Veteran also reported getting a sharp pain in his lower abdomen about 3-4 times a week lasting seconds to minutes at a time. The examiner noted that the Veteran did not have weight loss or malnutrition as a result of his IBS. 

The evidence includes a September 2013 VA examination. See Virtual VA, document dated 9/7/13. The Veteran stated that he no longer took medication for his IBS. He reported that he had diarrhea once a week and took over-the-counter Pepto Bismol, but no daily. The examiner noted that the Veteran experienced episodes of bowel disturbance with "occasional" abdominal distress. There was no weight loss or malnutrition. 

The Veteran was afforded a VA examination in November 2014 (in VBMS). During the evaluation, the Veteran reported symptoms of abdominal pain and cramping preceding by eating and worse with certain foods. Bowel movements were reported to be loose and watery occurring four to five times a day. Symptoms were not relieved by medication. The examiner noted that the Veteran had "frequent" episodes of bowel disturbance with abdominal distress. The examiner noted that the Veteran did not have weight loss or malnutrition as a result of his IBS. 

VA treatment records show continued diagnoses and treatment for IBS with diarrhea. 

Upon review of all the evidence of record, the Board finds that the evidence is in equipoise as to whether the Veteran's IBS disability more nearly approximates a 10 percent disability rating. The November 2011 and September 2013 VA examiners noted that the Veteran had "occasional" episodes of bowel disturbance with abdominal distress. On the other hand, the November 2014 VA examiner noted that the Veteran had "frequent" episodes of bowel disturbance with abdominal distress. All VA examiners found that the Veteran did not have weight loss or malnutrition as a result of his IBS. 

Based on this evidence, and resolving reasonable doubt in the Veteran's favor, the Board finds that the Veteran's IBS is manifested by frequent episodes of bowel disturbance with abdominal distress as specifically contemplated by the 10 percent disability rating under Diagnostic Code 7319.

The Board finds that Diagnostic Code 7319 is the appropriate diagnostic code for evaluating the Veteran's IBS as the rating criteria expressly take into account the Veteran's symptomatology. None of the other diagnostic codes for evaluating the digestive system are more appropriate in this case and they do not provide for a higher disability rating for the Veteran's IBS-related symptoms.

Further, the Board finds that a rating in excess of 10 percent is not warranted for the rating period on appeal as the evidence does not show that the Veteran's IBS has resulted in severe disability. Although the Veteran experiences diarrhea and abdominal cramping, the evidence does not show that there is more or less constant abdominal distress. The VA examination reports do not reflect that the Veteran's abdominal distress occurs so often to be greater than frequent. During the November 2011 VA examination, the Veteran reported "frequent" sharp abdominal pains. The Veteran stated that he had sharp pain in his lower abdomen about 3-4 times/week lasting seconds to minutes at a time. During the November 2014 VA examination, the Veteran reported symptoms of abdominal pain and cramping preceding by eating and worse with certain foods. He stated that they occurred four to five times a day. The examiner specifically noted that the Veteran had "frequent" episodes of bowel disturbance with abdominal distress, but not more or less constant abdominal distress. 

For these reasons, the Board finds that the Veteran's IBS disability more nearly approximates a 10 percent disability rating, but no higher, for the entire rating period on appeal.


 (CONTINUED ON NEXT PAGE)



Rating for Erectile Dysfunction 

The Veteran has been assigned a noncompensable rating for erectile dysfunction under Diagnostic Code 7522, which provides that a 20 percent rating is warranted when there is deformity of the penis with loss of erectile power.

The Veteran was afforded a VA examination in December 2011 (see Virtual VA document dated 5/11/12). The Veteran reported erectile dysfunction beginning in 2006 and helped by Cialis. Upon physical examination, the Veteran's penis and testes were normal. 

The evidence includes a September 2013 VA examination. See Virtual VA, document dated 9/7/13. Upon physical examination, the Veteran's penis and testes were normal. 

In a subsequent November 2014 VA examination (in VBMS), the Veteran reported that he was unable to obtain and maintain an erection sufficient for penetration and ejaculation without medication. The Veteran stated that the condition was relieved by medication. The examiner noted that the Veteran's penis and testes were not examined. 

Review of VA and private treatment records are negative for any diagnosis or treatment for a penis deformity.

Upon review of the evidence of record, the Board finds that the evidence does not demonstrate that the Veteran has a penile deformity together with loss of erectile power. Although the November 2014 VA examiner did not examine the Veteran's penis, the December 2011 and September 2013 VA examiners noted that the penis and testes were normal. The Veteran has not asserted that he has a penile deformity. As such, a 20 percent rating under Diagnostic Code 7522 is not warranted. 

The Board notes that the VA examiners also noted that the Veteran had a prostate condition; however, the Veteran is separately rated for an enlarged prostate and urinary frequency. The Veteran has also been granted special monthly compensation for loss of use of a creative organ. As such, these issues are not before the Board for consideration. 

Rating for Gynecomastia

The Veteran's gynecomastia disability has been assigned a noncompensable evaluation under Diagnostic Code 7628. Under Diagnostic Code 7628, benign neoplasms of the gynecological system or breast should be evaluated based upon the impairment in the function of the urinary or gynecological systems, or the skin. See 38 C.F.R. § 4.116.

A gynecological impairment is inapplicable to this Veteran. While the Veteran has some impairment of urinary function, the evaluation of the same disability under various diagnoses is to be avoided. 38 C.F.R. § 4.14 (2015). The Veteran's urinary disabilities are contemplated in the rating for his service-connected prostate disabilities.

The Board has also considered an evaluation for scaring under Diagnostic Codes 7801-7805. The Veteran was afforded a VA examination in November 2011. He was diagnosed with gynecomastia (i.e., swollen male breast tissue caused by a hormone imbalance). The Veteran reported that he began noticing breast enlargement shortly after enlisting in service. He was evaluated by a local surgeon and a mammogram was negative. The Veteran was offered surgery, but declined. The examiner noted that the breast enlargement had been essentially stable. A physical examination revealed no scars. 

The Veteran underwent a VA examination in September 2013. See Virtual VA, document dated 9/7/13. It was noted that the Veteran had not undergone breast surgery and had not completed any type of treatment. The Veteran denied having any problems with the breasts other than cosmetic. 

Although the Board notes the Veteran's reports of enlarged breasts, there is no evidence or report of scarring or a scar. He has never been diagnosed with a breast malignancy or undergone surgery to correct his gynecomastia. Moreover, the November 2011 VA examiner noted that the Veteran's breast enlargement had been essentially stable. Thus, these Codes relating to scars would not apply. 

The evidence of record does not warrant a compensable disability rating percent for the Veteran's gynecomastia disability under any scar or skin rating criteria. 
38 C.F.R. § 4.118. In this case, the Board finds no provision upon which to assign a compensable rating for gynecomastia.

Rating for PFB

The Veteran is currently assigned a noncompensable disability rating for pseudofolliculitis barbae, under Diagnostic Code 7828 for acne. 38 C.F.R. § 4.119.

Upon review of the evidence of record, the Board finds that Diagnostic Code 7813 more appropriately contemplates the Veteran's symptoms. Dermatophytosis (ringworm: of body, tinea corporis; of head, tinea capitis; of feet, tinea pedis; of beard area, tinea barbae; of nails, tinea unguium; of inguinal area (jock itch), tinea cruris) is rated under Diagnostic Code 7813. The rating criteria states that such disability should be rated as disfigurement of the head, face, or neck (Diagnostic Code 7800), scars (Diagnostic Codes 7801, 7802, 7803, 7804, or 7805), or dermatitis (Diagnostic Code 7806), depending upon the predominant disability.

Under Diagnostic Code 7806, dermatitis is rated 0 percent when less than 5 percent of the entire body or of exposed areas is affected, and no more than topical therapy is required during the past 12 month period. A 10 percent rating is assigned when at least 5 percent but less than 20 percent of the entire body or of exposed areas is affected, or intermittent systemic therapy such as corticosteroids or other immunosuppressive drugs required for a total duration of less than 6 weeks during the past 12 month period. A 30 percent rating is assigned when 20 to 40 percent of the entire body or of exposed areas is affected, or systemic therapy such as corticosteroids or other immunosuppressive drugs required for a total duration of 6 weeks or more, but not constantly, during the past 12 month period. The highest rating of 60 percent is assigned when more than 40 percent of the entire body or more than 40 percent of exposed areas are affect, or; constant or near-constant systemic therapy such as corticosteroids or other immunosuppressive drugs is required during a twelve month period. 38 C.F.R. § 4.118, Diagnostic Code 7806. Given the Veteran's symptoms and treatment regimen for his PFB, the Board finds that Diagnostic Code 7806 is the most appropriate rating criteria. 

The Veteran was afforded a VA skin examination in December 2011. (see Virtual VA document dated 5/11/12). The Veteran reported having bumps on his neck after shaving. Symptoms included red, tender papules. The Veteran used triamcinolone, a topical corticosteroid. Upon physical examination, the examiner noted that the Veteran had several hyperpigmented papules on the anterior neck beard area. The examiner noted that the Veteran's PFB affected 3 percent of the Veteran's total body area. 

In a September 2013 VA skin examination (in Virtual VA, document dated 9/7/13), the Veteran was diagnosed with PFB. The Veteran reported having problems with razor bumps on his face while in service. Upon physical examination, the VA examiner noted that the Veteran did not have any scars on his face or neck. He had also not been treated with oral or topical medication in the past 12 months. The examiner noted that the Veteran's PFB affected less than 5 percent of the Veteran's total body area. 

The evidence also includes a November 2014 VA skin examination (in VBMS). The examiner diagnosed the Veteran with PFB. The Veteran reported that he was unable to shave as his skin would become irritated with ingrown hairs. The Veteran also stated that his condition was controlled on tretinoin. Upon physical examination, the examiner noted that the Veteran's PFB affected less than 5 percent of the Veteran's total body area. 

Upon review of the evidence of record, the Board finds that the Veteran's PFB does not more nearly approximates a 10 percent rating under Diagnostic Code 7806. None of the VA examiners noted that the Veteran's PFB affected 5 percent or more of the Veteran's total body area. The evidence also does not show that the Veteran has used intermittent systemic therapy such as corticosteroids or other immunosuppressive drugs for a total duration of less than 6 weeks during the past 12 month period. As such, the Board finds that a compensable rating is not warranted for the Veteran's PFB for the rating period on appeal.

Extraschedular Consideration

The Board has considered whether referral for an extraschedular evaluation is warranted. In exceptional cases an extraschedular rating may be provided. 
38 C.F.R. § 3.321 (2015). The threshold factor for extraschedular consideration is a finding that the evidence before VA presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. Therefore, initially, there must be a comparison between the level of severity and symptomatology of the claimant's service-connected disabilities with the established criteria found in the Rating Schedule for that disability. Thun v. Peake, 22 Vet. App. 111 (2008). 

Under the approach prescribed by VA, if the criteria reasonably describe the claimant's disability level and symptomatology, then the claimant's disability picture is contemplated by the Rating Schedule, the assigned schedular evaluation is, therefore, adequate, and no referral is required. In the second step of the inquiry, however, if the schedular evaluation does not contemplate the claimant's level of disability and symptomatology, and is found inadequate, the RO or Board must determine whether the claimant's exceptional disability picture exhibits other related factors such as those provided by the regulation as "governing norms." 
38 C.F.R. § 3.321(b)(1) (related factors included "marked interference with employment" and "frequent periods of hospitalization"). When the Rating Schedule is inadequate to evaluate a claimant's disability picture and that picture has related factors such as marked interference with employment or frequent periods of hospitalization, then the case must be referred to the Under Secretary for Benefits or the Director of the Compensation and Pension Service for completion of the third step-a determination of whether, to accord justice, the claimant's disability picture requires the assignment of an extraschedular rating. Id. 

The Board finds that the schedular evaluation assigned for the Veteran's service-connected disabilities is adequate in this case. Here, the schedular rating criteria used to rate the Veteran's disability adequately describe and assess the Veteran's disability level and symptomatology. The lay and medical evidence does not show anything unique or unusual that would render the schedular criteria inadequate. Throughout the initial rating period on appeal, the Veteran's left ring finger disability is the maximum rating that could be assigned under the amputation rule.

The rating criteria reasonably describe the Veteran's allergic rhinitis disability level and symptomatology, including the percentage of obstruction of nasal passages and the presence of nasal polyps. These symptoms and their resulting effects are fully contemplated by the rating schedule.

With respect to the Veteran's service-connected IBS, the disability was evaluated as a condition of the digestive system pursuant to 38 C.F.R. § 4.114, Diagnostic Code 7319 for irritable colon syndrome. The criteria are also found by the Board to specifically contemplate the level of occupational and social impairment caused by this disability. The Veteran's IBS has resulted in diarrhea and abdominal cramps. These types of symptoms are considered in the rating criteria when assessing the disability as analogous to irritable colon syndrome. When comparing this disability picture with the symptoms contemplated by the Rating Schedule, the Board finds that the Veteran's experiences are congruent with the disability picture represented by a 10 percent disability rating for IBS.

Regarding the Veteran's erectile dysfunction, the record does not establish that the rating criteria are inadequate. To the contrary, the symptoms that the Veteran describes and the findings made by the various medical professionals, such as loss of erectile power, are the symptoms included in the criteria found in the rating schedule for his disability. Neither the Veteran nor the medical evidence of record shows that the Veteran has a penile deformity. The Veteran has also been granted special monthly compensation for loss for loss of a creative organ. 

In regard to the Veteran's gynecomastia, the Veteran was noted to experience breast enlargement. He has not identified any residual disability or physical complaints that have not been contemplated. He has not had surgery and the November 2011 VA examiner noted that the Veteran's breast enlargement had been essentially stable. The rating criteria reasonable describe the Veteran's disability levels and symptomatology pertaining to his service-connected gynecomastia.

The Veteran's PFB has been shown to affect less than 5 percent of the Veteran's total body area. The Veteran has not been shown to require systemic therapy such as corticosteroids or other immunosuppressive drugs for a total duration of 6 weeks or more, but not constantly, during the past 12 month period. 

The schedular rating criteria that have been applied in this case reasonably and adequately describe the Veteran's disability picture and therefore referral for consideration of extraschedular ratings is not warranted. 

The schedule is intended to compensate for average impairments in earning capacity resulting from service-connected disability in civil occupations. 
38 U.S.C.A. § 1155. "Generally, the degrees of disability specified [in the Rating Schedule] are considered adequate to compensate for considerable loss of working time from exacerbations or illnesses proportionate to the severity of the several grades of disability." 38 C.F.R. § 4.1. In this case, the problems reported by the Veteran regarding the service-connected disabilities are specifically contemplated by the criteria discussed above, including the effect of the Veteran's symptoms on his occupation and daily life. In the absence of exceptional factors associated with the Veteran's disabilities, the Board finds that the criteria for submission for assignment of an extraschedular rating pursuant to 38 C.F.R. § 3.321(b)(1) are not met. See Bagwell v. Brown, 9 Vet. App. 337 (1996); Shipwash v. Brown, 8 Vet. App. 218, 227 (1995).

According to Johnson v. McDonald, 762 F.3d 1362 (Fed. Cir. 2014), a veteran may be entitled to "consideration [under 38 C.F.R. § 3.321(b)] for referral for an extra-schedular evaluation based on multiple disabilities, the combined effect of which is exceptional and not captured by schedular evaluations." Referral for an extraschedular rating under 38 C.F.R. § 3.321(b) is to be considered based upon either a single service-connected disability or upon the "combined effect" of multiple service-connected disabilities when the "collective impact" or "compounding negative effects" of the service-connected disabilities, when such presents disability not adequately captured by the schedular ratings for the service-connected disabilities. 

In this case, the Veteran has not asserted, and the evidence of record has not suggested, any such combined effect or collective impact of multiple service-connected disabilities that create such an exceptional circumstance to render the schedular rating criteria inadequate. In this case, there is neither allegation nor indication that the collective impact or combined effect of more than one service-connected disability presents an exceptional or unusual disability picture to render inadequate the schedular rating criteria. 

The Board has also considered whether an inferred claim for a total disability rating based on individual unemployability (TDIU) under Rice v. Shinseki, 22 Vet. App. 447 (2009) has been raised. It is noted that the Veteran is currently in receipt of a combined 100 percent schedular evaluation for his service-connected disabilities; however, this fact alone does not end the inquiry. See Bradley v. Peake, 22 Vet. App. 280 (2008). In Bradley, the Court held that there could be a situation where a veteran has a schedular total rating for a particular service-connected disability, and could establish a TDIU rating for another service-connected disability in order to qualify for special monthly compensation (SMC) under 38 U.S.C. § 1114(s) by having an 'additional' disability of 60 percent or more ('housebound' rate). See 
38 U.S.C.A. § 1114(s). Thus, Bradley made it such that even with the assignment of a total schedular rating, the issue of TDIU was potentially not moot.

The Board notes that the Veteran has been granted SMC under 38 U.S.C. 
§ 1114(k) for loss of a creative organ. In accordance with Bradley, the Board has also considered whether the service-connected disabilities of record raise a claim for SMC for aid and attendance or at the housebound rate under 38 U.S.C. 
§ 1114(s). In this case, the Veteran does not have a single service-connected disability rated as 100 percent disabling. As he does not have a single service-connected disability rated as 100 percent disabling, the issue of SMC at the housebound rate under 38 U.S.C.A. § 1114(s) is not implicated.

Service Connection Laws and Regulations

Service connection may be granted for a disability resulting from disease or injury incurred in or aggravated by active military, naval, or air service. 38 U.S.C.A. 
§§ 1110, 1131; 38 C.F.R. § 3.303(a). Service connection may be granted for any disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d). The condition of sensorineural hearing loss, primary anemia, and hypertension are "chronic disease[s]" listed under 38 C.F.R. § 3.309(a) (2015); therefore, the presumptive service connection provision of 38 C.F.R. § 3.303(b) would generally apply to those claims. Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013). The conditions of malaria, sleep apnea, and dry skin are not chronic disease listed under 38 C.F.R. § 3.309(a) and will be adjudicated using the general principles of service connection. 

Establishing service connection generally requires (1) medical evidence of a current disability; (2) medical or, in certain circumstances, lay evidence of in-service incurrence or aggravation of a disease or injury; and (3) medical evidence of a nexus between the claimed in-service disease or injury and the present disability. Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004). The U.S. Court of Appeals for Veterans Claims (Court) has held that "Congress specifically limits entitlement for service-connected disease or injury to cases where such incidents have resulted in a disability. In the absence of proof of a present disability there can be no valid claim." Brammer v. Derwinski, 3 Vet. App. 223, 225 (1992); see also Rabideau v. Derwinski, 2 Vet. App. 141, 143-44 (1992).

In rendering a decision on appeal the Board must analyze the credibility and probative value of the evidence, account for the evidence which it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the claimant. Gabrielson v. Brown, 7 Vet. App. 36, 39-40 (1994); Gilbert v. Derwinski, 1 Vet. App. 49, 57 (1990). Competency of evidence differs from weight and credibility. Competency is a legal concept determining whether testimony may be heard and considered by the trier of fact, while credibility is a factual determination going to the probative value of the evidence to be made after the evidence has been admitted. Rucker v. Brown, 10 Vet. App. 67, 74 (1997); Layno v. Brown, 6 Vet. App. 465, 469 (1994); see also Cartright v. Derwinski, 2 Vet. App. 24, 25 (1991) ("although interest may affect the credibility of testimony, it does not affect competency to testify").

Generally, the degree of probative value which may be attributed to a medical opinion issued by a VA or private treatment provider takes into account such factors as its thoroughness and degree of detail, and whether there was review of the claims file. See Prejean v. West, 13 Vet. App. 444, 448-9 (2000). Also significant is whether the examining medical provider had a sufficiently clear and well-reasoned rationale, as well as a basis in objective supporting clinical data. See Bloom v. West, 12 Vet. App. 185, 187 (1999); Hernandez-Toyens v. West, 11 Vet. App. 379, 382 (1998); see also Claiborne v. Nicholson, 19 Vet. App. 181, 186 (2005) (rejecting medical opinions that did not indicate whether the physicians actually examined the veteran, did not provide the extent of any examination, and did not provide any supporting clinical data). The Court has held that a bare conclusion, even one reached by a health care professional, is not probative without a factual predicate in the record. Miller v. West, 11 Vet. App. 345, 348 (1998).

A significant factor to be considered for any opinion is the accuracy of the factual predicate, regardless of whether the information supporting the opinion is obtained by review of medical records or lay reports of injury, symptoms and/or treatment, including by a veteran. See Harris v. West, 203 F.3d 1347, 1350-51 (Fed. Cir. 2000) (examiner's opinion based on accurate lay history deemed competent medical evidence in support of the claim); Kowalski v. Nicholson, 19 Vet. App. 171, 177 (2005) (holding that a medical opinion cannot be disregarded solely on the rationale that the medical opinion was based on history given by the veteran); Reonal v. Brown, 5 Vet. App. 458, 461 (1993) (holding that the Board may reject a medical opinion based on an inaccurate factual basis).

When all the evidence is assembled, VA is responsible for determining whether the evidence supports the claim or is in relative equipoise, with the veteran prevailing in either event, or whether a preponderance of the evidence is against a claim, in which case, the claim is denied. 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102.
Service Connection for Bilateral Hearing Loss

The Veteran is seeking service connection for bilateral hearing loss, which he contends is related to service.

Upon review of all the evidence of record, the Board finds that service connection for bilateral hearing loss is not warranted as the Veteran does not have hearing loss to a disabling degree in either ear that meets the criteria at 38 C.F.R. § 3.385 for VA compensation purposes.

Impaired hearing is considered a disability for VA compensation purposes when the auditory threshold in any of the frequencies of 500, 1,000, 2,000, 3,000, or 4,000 Hertz is 40 decibels or greater; the thresholds for at least three of these frequencies are 26 or greater; or when speech recognition scores using the Maryland CNC Test are less than 94 percent. 38 C.F.R. § 3.385. The Court has held that a veteran may establish the required nexus between current hearing loss disability and his term of military service if he can show by competent evidence that his hearing loss disability resulted from the in-service acoustic trauma even where the hearing loss disability does not arise in service. Godfrey v. Derwinski, 2 Vet. App. 352 (1992).

The evidence includes a September 2011 audiogram from Dr. Kimble. See Virtual VA document titled STR 10/6/11, pg. 33-34. Dr. Kimble's report noted that the audiogram was "essentially normal." Puretone thresholds at the test frequencies of 500, 1000, 2000, 3000, and 4000 Hertz in the right ear were 15, 20, 50, 50, and 10, respectively. In the left ear, puretone thresholds at the test frequencies of 500, 1000, 2000, 3000, and 4000 Hertz were 15, 15, 20, 15, and 15 respectively. Speech discrimination in the right ear was 92 percent and in the left ear it was at 96 percent. It was indicated that speech discrimination ability was tested using the W-22 word list. Accordingly, the Board finds that speech recognition scores in the September 2011 evaluation lack probative value. See 38 C.F.R. § 3.385.

The Veteran was afforded a VA audiological examination in November 2011 (in Virtual VA, see document dated 5/11/12). During the evaluation, puretone thresholds at the test frequencies of 500, 1000, 2000, 3000, and 4000 Hertz in the right ear were 20, 20, 15, 20, and 15, respectively, with speech discrimination in the right ear at 96 percent. In the left ear, puretone thresholds at the test frequencies of 500, 1000, 2000, 3000, and 4000 Hertz were 15, 15, 15,10, and 10 respectively, with speech discrimination in the left ear at 100 percent.

The Board has reviewed the remaining evidence of record; however it does not demonstrate a hearing impairment that meets the criteria for hearing loss disability for VA compensation purposes.

As the Veteran's right and left ear auditory thresholds in any of the frequencies of 500, 1000, 2000, 3000, or 4000 Hertz were not 40 decibels or greater, the thresholds for at least three of these frequencies were not 26 or greater, and the speech recognition scores using the Maryland CNC Test were not less than 94 percent, the criteria for a current right or left ear hearing loss "disability" have not yet been met as required by 38 C.F.R. § 3.385. As noted above, the September 2011 private audiology report used the W-22 word list and not the Maryland CNC Speech Recognition Test; as such, these findings cannot be used to evaluate the Veteran's current bilateral hearing loss. 

Because the evidence does not show that the Veteran's right or left ear hearing loss is to a disabling degree according to 38 C.F.R. § 3.385, the weight of the evidence demonstrates that the Veteran's bilateral hearing loss has not met the threshold to establish current hearing loss "disability," and the claim must be denied. The Court has held that "Congress specifically limits entitlement for service-connected disease or injury to cases where such incidents have resulted in a disability. In the absence of proof of a present disability there can be no valid claim." Brammer, 3 Vet. App. at 225; see also Rabideau, 2 Vet. App. at 143-44. Because the preponderance of the evidence is against the claim for service connection for bilateral hearing loss, the benefit of the doubt doctrine is not for application. See 38 U.S.C.A. § 5107; 
38 C.F.R. § 3.102.

Service Connection for Malaria

The Veteran contends that he had malaria while serving in Somalia in 1993. Accordingly, he contends that service connection is warranted.

Upon review of all the evidence of record, lay and medical, the Board finds that the Veteran does not have a current diagnosis of active malaria or any residual symptoms of malaria. 

Service treatment records are negative for any complaints, diagnoses, or treatment for malaria. Service treatment records do show that the Veteran was placed on initial malaria chemoprophylaxis (i.e., preventive treatment of malaria) on January 1993 through March 1993 prior to entering a malaria transmission zone. See Virtual VA STR document dated 10/6/11, pg. 73.

The Veteran was afforded a VA infectious disease examination in December 2011 (in Virtual VA, see document dated 5/11/12). During the evaluation, the Veteran reported that he was in Somalia in 1993 and was told he had malaria. He stated that he was given medication for a couple of weeks and had done well since that time. There was no recurrence. The Veteran also could not remember what symptoms he had at that time, aside from feeling "quite ill." The examiner diagnosed the Veteran with inactive malaria with no residuals. The Veteran was noted to have no pertinent physical findings, complications, conditions, signs, or symptoms related to inactive malaria. 

The Board has reviewed the remaining evidence of record; however it does not demonstrate a current diagnosis of active malaria or any residuals of malaria. 

The Board has considered the Veteran's statements regarding his belief that he has malaria. As a lay person, the Veteran is competent to relate some symptoms that may be associated with malaria, but he does not have the requisite medical knowledge, training, or experience to be able to diagnose the medically complex disorder of malaria. See Kahana v. Shinseki, 24 Vet. App. 428, 437 (2011) (recognizing ACL injury is a medically complex disorder that requires a medical opinion to diagnose and to relate to service or differentiate from in-service symptoms and diagnosis). Malaria is a medically complex disease process because it requires testing to diagnose (such as a blood test), and manifests even observable symptomatology that may overlap with other disorders. Woehlaert v. Nicholson, 21 Vet. App. 456, 462 (2007) (holding that rheumatic fever is not a condition capable of lay diagnosis).

The evidence of record does not show that the Veteran has a current diagnosis of active malaria or any residuals therefrom. As noted above, in the absence of proof of a present disability there can be no valid claim." Brammer, 3 Vet. App. at 225; see also Rabideau, 2 Vet. App. at 143-44. Because the preponderance of the evidence is against the claim for service connection for malaria, the benefit of the doubt doctrine is not for application. See 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102.

Service Connection for Sleep Apnea

The Veteran contends that he had difficulty sleeping while in service and that service connection for sleep apnea is warranted.

Upon review of all the evidence of record, lay and medical, the Board finds that the Veteran does not have a current diagnosis of sleep apnea. 

Service treatment records show that the Veteran had sleep disturbances, but no diagnosis of sleep apnea. In a March 2011 sleep study, the Veteran was informed that his sleep study was negative as there were no sleep-related breathing disorders. The primary diagnosis was sleep disturbances. See Virtual VA STR dated10/6/11, pgs. 15-18.

The Veteran underwent a VA examination in December 2011. See Virtual VA, document dated 5/11/12. During the evaluation, the Veteran reported having a history of loud snoring and stated that he had been told that he had periods where he stopped breathing in his sleep. He reported having excessive daytime fatigue. The examiner noted that the Veteran underwent a sleep study on March 23, 2011, which showed no sleep-related breathing disorder. 

The Board has reviewed the remaining evidence of record; however it does not demonstrate a current diagnosis of sleep apnea. 

Although the Veteran had been diagnosed with sleep disturbance, the weight of the evidence does not demonstrated a diagnosis of sleep apnea. Sleep apnea is defined as "transient periods of cessation of breathing during sleep." See Dorland's Illustrated Medical Dictionary 117 (32nd ed. 2012). 

The Board has considered the Veteran's statements regarding his belief that he has sleep apnea. As a lay person, the Veteran is competent to relate some symptoms that may be associated with sleep apnea, such as daytime drowsiness and difficulty sleeping, but he does not have the requisite medical knowledge, training, or experience to be able to diagnose the medically complex disorder of obstructive sleep apnea. See Kahana v. Shinseki, 24 Vet. App. 428, 437 (2011) (recognizing ACL injury is a medically complex disorder that requires a medical opinion to diagnose and to relate to service or differentiate from in-service symptoms and diagnosis). Obstructive sleep apnea is a medically complex disease process because of its multiple possible etiologies, requires testing to diagnose (such as a sleep study), and manifests even observable symptomatology that may overlap with other disorders. Woehlaert v. Nicholson, 21 Vet. App. 456, 462 (2007) (holding that rheumatic fever is not a condition capable of lay diagnosis).

Because the Veteran has not been diagnosed with sleep apnea, the preponderance of the evidence is against the claim as the Veteran does not have a current disability. In the absence of proof of a present disability there can be no valid claim." Brammer, 3 Vet. App. at 225; see also Rabideau, 2 Vet. App. at 143-44. Accordingly, service connection for sleep apnea is not warranted. 

 (CONTINUED ON NEXT PAGE)



Service Connection for Anemia

The Veteran contends that service connection for anemia is warranted as he claims to have had a diagnosis of anemia in service. 

Upon review of all the evidence of record, lay and medical, the Board finds that the Veteran does not have a current diagnosis of anemia. 

The service treatment records are negative for anemia. The Veteran underwent a hematologic VA examination in December 2011. See Virtual VA, document dated 5/11/12. The Veteran stated that during night training he felt cold and was trembling. He attributed this to anemia, but was never formally diagnosed with anemia. The Veteran stated that he did not recall ever having any blood tests that documented anemia. After conducting laboratory testing, the examiner noted that the Veteran's hemoglobin level was normal. The examiner noted that the Veteran did not have a current diagnosis of anemia and stated that the Veteran had given himself a diagnosis of anemia due to cold intolerance. 
The remaining evidence of record does not show that the Veteran has been diagnosed with anemia. 

The Board has considered the Veteran's statements regarding his belief that he has anemia. As a lay person, the Veteran is competent to relate some symptoms that may be associated with anemia, but he does not have the requisite medical knowledge, training, or experience to be able to diagnose the medically complex disorder of anemia. See Kahana v. Shinseki, 24 Vet. App. 428, 437 (2011) (recognizing ACL injury is a medically complex disorder that requires a medical opinion to diagnose and to relate to service or differentiate from in-service symptoms and diagnosis). Anemia is a medically complex disease process because of its multiple possible etiologies, requires testing to diagnose (such as a blood test), and manifests even observable symptomatology that may overlap with other disorders. Woehlaert v. Nicholson, 21 Vet. App. 456, 462 (2007) (holding that rheumatic fever is not a condition capable of lay diagnosis).

For these reasons, the Board finds that the preponderance of the evidence is against the claim for service connection for anemia; accordingly, the benefit of the doubt doctrine is not for application. See 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102.

Service Connection for Hypertension

The Veteran contends that he had some elevated blood pressure readings during service and that he was told that he had borderline hypertension. 

Upon review of all the evidence of record, lay and medical, the Board finds that the Veteran does not have a current diagnosis of hypertension. Under Diagnostic Code 7101, hypertension is defined as dialostic blood pressure predominantly 90mm or greater, or isolated systolic blood pressure 160mm or greater. 38 C.F.R. § 4.104 (2015), Note 1.

Service treatment records are negative for any diagnosis or treatment for hypertension. Post-service VA treatment record, as recent as June 2015, do not show a diagnosis for hypertension. 

The Veteran was afforded a VA hypertension examination in December 2011. See Virtual VA, document dated 5/11/12. The examiner noted that the Veteran's blood pressure was 116/71 on December 2, 2011, and 144/81 on December 7, 2011. The examiner then stated that the Veteran did not have a diagnosis of hypertension and had never been treated for hypertension. Upon review of VA treatment records, the examiner noted that the Veteran had normal blood pressure readings on almost all recent visits. The Veteran also had an echocardiogram in November 2011 that showed a normal EF of 55-60%, normal wall thickness, and no wall motion abnormalities. 

The Board has considered the Veteran's statements regarding his belief that he has hypertension. As a lay person, the Veteran is competent to relate some symptoms that may be associated with hypertension, such as chest pain or dizziness, but he does not have the requisite medical knowledge, training, or experience to be able to diagnose the medically complex disorder of hypertension. See Kahana v. Shinseki, 24 Vet. App. 428, 437 (2011) (recognizing ACL injury is a medically complex disorder that requires a medical opinion to diagnose and to relate to service or differentiate from in-service symptoms and diagnosis). Hypertension is a medically complex disease process because of its multiple possible etiologies, requires testing to diagnose, and manifests even observable symptomatology that may overlap with other disorders. Woehlaert v. Nicholson, 21 Vet. App. 456, 462 (2007) (holding that rheumatic fever is not a condition capable of lay diagnosis).

For these reasons, the Board finds that the preponderance of the evidence is against the claim for service connection for hypertension; accordingly, the benefit of the doubt doctrine is not for application. See 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102.




 (CONTINUED ON NEXT PAGE)






ORDER

An initial rating of 10 percent, but no higher, for residuals of the left ring finger proximal phalanx fracture, is granted.

An initial compensable rating for allergic rhinitis is denied.

An initial rating of 10 percent, but no higher, for IBS is granted.

An initial compensable rating for erectile dysfunction is denied. 

An initial compensable rating for gynecomastia is denied.

An initial compensable rating for PFB is denied. 

Service connection for bilateral hearing loss is denied. 

Service connection for malaria is denied. 

Service connection for obstructive sleep apnea is denied.

Service connection for anemia is denied. 

Service connection for hypertension is denied.


REMAND

The Veteran has been diagnosed with eczema. See September 2013 VA examination. During the examination, the Veteran reported having flare-ups of the skin with itching and a rash. At the time of examination, the Veteran stated that he had a rash to the popliteal area, supra pubic area, and antecubital area. 

Service treatment records show treatment for skin rashes during service. See service treatment records dated in October 1994 (in Virtual VA). Moreover, although the Veteran has already been service-connected for other skin disorders (PFB, tinea pedis, and dermatitis of the scalp), these disability do not consider the Veteran's eczema rashes on other parts of his body (i.e., not of the head, face, or feet). 

As an opinion regarding the etiology of the Veteran's eczema has not been obtained, the Board finds that a remand is warranted. 

Accordingly, the case is REMANDED for the following actions:

1. The RO/AMC should obtain a medical opinion from the examiner who performed the September 2013 and diagnosed the Veteran with eczema. If that examiner is not available, obtain an opinion from another appropriate VA examiner. If the examiner determines that additional examination of the Veteran is necessary to provide a reliable opinion, such examination should be scheduled; however, the Veteran should not be required to report for another examination if it is not found to be necessary. The entire record should be made available to and reviewed by the VA examiner. The examiner is asked to provide the following opinion:

Is it at least as likely as not (i.e., a 50 percent or greater probability) that the Veteran's currently diagnosed eczema was incurred in service or is otherwise related to service? 

A rationale for all opinions expressed should be provided. If the physician cannot respond without resorting to speculation, the physician should explain why a response would be speculative.

2. Then, the AOJ should readjudicate the claim on the merits. If the benefit sought is not granted, the Veteran and his representative should be furnished a supplemental statement of the case and afforded a reasonable opportunity to respond before the record is returned to the Board for further review.

The Veteran has the right to submit additional evidence and argument on the matter the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).




______________________________________________
K. J. ALIBRANDO
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs